[Cite as *Marion Forum, L.L.C. v. Lynick Ents., Inc.*, 2012-Ohio-5947.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY**


MARION FORUM, LLC,

    PLAINTIFF-APPELLANT,                 CASE NO. 9-12-13

    v.

LYNICK ENTERPRISES, INC., ET AL.,

                                    **O P I N I O N**

    DEFENDANTS-APPELLEES.


**Appeal from Marion County Common Pleas Court
Trial Court No. 09-CV-0487**

**Judgment Affirmed**

**Date of Decision: December 17, 2012**


**APPEARANCES:**

    *Kevin P. Collins*  for Appellant

    *Brent M. Harraman*  for Appellee

**PRESTON, J.**

{**¶1**} Plaintiff-appellant, Marion Forum, LLC, appeals the Marion County Court of Common Pleas' jury verdict finding that Marion Forum breached its contract with defendant-appellee Lynick Enterprises, Inc., and awarding Lynick a total of $304,411.96 in damages, attorney fees, costs, and prejudgment interest. Marion Forum contends the jury's verdict is against the manifest weight of the evidence, is supported by insufficient evidence, that Lynick failed to establish its lost profits with sufficient certainty, and that the trial court erred by awarding Lynick prejudgment interest and expert witness fees. For the reasons that follow, we affirm.

{**¶2**} On January 7, 2009, Marion Forum filed a complaint against Lynick in the Marion Municipal Court. (Doc. No. 1). Marion Forum alleged Lynick had breached the terms of its lease agreement by failing to pay rent and late charges amounting to $5,263.16. (*Id.*).

{**¶3**} On March 17, 2009, Lynick filed its answer and counterclaim. (*Id.*). Lynick alleged that Marion Forum had breached the terms of the lease agreement by failing to properly maintain the common area. (*Id.*). Lynick sought damages in excess of $25,000. (*Id.*).

{**¶4**} On May 12, 2009, Lynick filed a motion to transfer the case to the Marion County Court of Common Pleas because its counterclaim exceeded the

Marion Municipal Court's monetary jurisdiction. (*Id*.). On June 8, 2009, the Marion Municipal Court granted Lynick's motion and ordered the clerk of courts to transfer the case to the Marion County Court of Common Pleas. (*Id*.).

{¶5} On January 24, 2011, Marion Forum filed a motion to exclude an expert report and testimony by Howard Cannon, whom Lynick had identified as its expert witness. (Doc. No. 41). On February 10, 2011, Lynick filed its motion in response. (Doc. No. 45).

{¶6} The matter proceeded to a jury trial on March 14-17, 2011, where the trial court admitted Cannon's expert testimony and report. (Tr. Vol. I at 1); (Tr. Vol. III at 461). On March 17, 2011, the jury found in favor of Lynick and awarded Lynick $225,000 in damages. (Doc. No. 69).

{¶7} On March 21, 2011, Lynick filed a motion requesting attorney fees and costs based on the parties' lease agreement. (Doc. No. 70). On April 6, 2011, Marion Forum filed its motion in response. (Doc. No. 77). On June 7, 2011, the parties waived any right they had to a hearing on the issue of attorney fees and costs and requested that the trial court make its ruling based on their motions. (Doc. No. 79). On June 9, 2011, the trial court issued its judgment entry confirming the jury's verdict of $225,000 and granting Lynick's motion for attorney fees of $36,370.52 and expert witness fees of $20,619.58. (Doc. No. 80).

The trial court granted judgment in favor of Lynick for a total of $281,990.10. (*Id*.).

{¶8} On June 10, 2011, Lynick filed a motion for an award of prejudgment interest. (Doc. No. 82). On June 27, 2011, Marion Forum filed its motion in response. (Doc. No. 86).

{¶9} On July 5, 2011, Marion Forum filed a notice of appeal of the trial court's June 9, 2011 judgment. (Doc. No. 88). This Court dismissed that appeal, finding that the trial court's judgment was a non-final order since there were issues the trial court still needed to resolve. (Doc. No. 91).

{¶10} On October 13, 2011, the trial court held a hearing on Lynick's motion for prejudgment interest. (Doc. No. 96). On November 15, 2011, the trial court filed its judgment entry granting Lynick's motion for prejudgment interest. (*Id*.). On November 30, 2011, the trial court issued a judgment entry awarding Lynick prejudgment interest in the amount of $22,421.86. (Doc. No. 97).

{¶11} Marion Forum timely appealed. Marion Forum now raises seven assignments of error for our review. For the purposes of our discussion, we will address the assignments of error out of the order presented in the briefs and consolidate them where appropriate.

**Assignment of Error No. I**

**The manifest weight of the evidence established that defendant-appellee was in default of the contract and was liable for damages**

**Assignment of Error No. III**

**The manifest weight of the evidence establishes that plaintiff-appellant was not in default under the contract**

{¶12} In its first and third assignments of error, Marion Forum argues the jury's verdict was against the manifest weight of the evidence. Marion Forum contends that the manifest weight of the evidence established that Lynick was in default under the contract. Marion Forum argues the jury lost its way because Marion Forum was not in default according to the terms of the lease. Marion Forum also contends that Lynick failed to give appropriate notice pursuant to the lease, so Marion Forum could not have breached the contract because proper notice was required prior to default.

{¶13} In determining whether a judgment is against the manifest weight of the evidence, we cannot substitute our judgment for that of the jury. The jury is in a better position to observe the demeanor of the witnesses, examine the evidence, and weigh the credibility of the testimony and evidence. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Instead, we must determine whether the jury's verdict is supported by some competent, credible evidence going to all the

essential elements of the case. *Id*.; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).

**{¶14}** A complaining party establishes a claim for breach of contract by proving the following elements by a preponderance of the evidence: "(1) a contract existed, (2) the complaining party fulfilled its contractual obligations, (3) the opposing party failed to fulfill its obligations, and (4) the complaining party incurred damages as a result of this failure." *Langfan v. Carlton Gardens Company*, 183 Ohio App.3d 260, 2009-Ohio-3318, ¶ 25 (3d Dist.), citing *Farmers State Bank v. Followay*, 9th Dist. No. 07CA0011, 2007-Ohio-6399, ¶ 13.

**{¶15}** In the present case, the parties do not dispute the validity of their lease agreement. Marion Forum simply contends that it did not violate the terms of the lease agreement, that Lynick did violate the terms of the lease agreement, and that Lynick did not incur any damage as a result of Marion Forum's alleged breach. We will first address Marion Forum's argument that Lynick cannot prevail because it did not provide notice according to the terms of the contract, then address whether the jury's verdict was against the manifest weight of the evidence.

A. *Notice*

**{¶16}** The parties stipulated that Lynick did not pay its common area maintenance charges during the summer of 2008. (Tr. Vol. I at 6-7); (Joint Ex. 1).

The parties further stipulated that if Lynick were found liable for the unpaid common area maintenance charges, that Lynick would owe Marion Forum $5,263.16. (*Id.*); (*Id.*). Lynick argued at trial, and argues on appeal, that it stopped paying its common area maintenance charges because Marion Forum had violated the lease agreement by not maintaining the common area as required. The lease states:

> In the event [Marion Forum] defaults in the performance of any of its obligations, covenants and warranties hereunder and if such default continues for a period of thirty (30) days after written notice to [Marion Forum] from [Lynick] specifying the nature of such default or such additional cure period as is reasonable under the circumstances if such default is not capable of cure within thirty (30) days provided [Marion Forum] has commenced to cure the default within the thirty (30) day period and thereafter diligently completes same. If [Marion Forum] or its mortgagee does not cure the default within the aforesaid time periods, [Lynick] may, at its option, and upon at least an additional ten (10) days written notice to [Marion Forum] and its mortgagee, cure the same on behalf of [Marion Forum], whereupon the cost of such curing and any out-of-pocket expenses reasonably and necessarily arising as a consequence

thereof, shall be due and payable to [Lynick] from [Marion Forum] upon demand therefor by [Lynick] * * *. The foregoing shall be for [Lynick's] protection only and exercisable only at its option. The foregoing shall not limit or preclude [Lynick] from any other rights and remedies available at law or in equity.

(D. Ex. T). The notice provision of the lease further states, "[a]ll notices, demands and communications provided herein shall be sent by United States registered mail, postage prepaid, return receipt requested, nationally-recognized mail carrier (such as Federal Express, UPS Next Day Air, etc.) * * *." (*Id.*).

{¶17} At trial, Lynick, which operated as CiCi's Pizza in Marion, alleged that Marion Forum had failed to address numerous maintenance issues. Specifically, Lynick claimed Marion Forum did not replace burnt out lights resulting in inadequate exterior lighting, that Marion Forum failed to remove trash from the outdoor area, that snow and ice was not adequately cleared from the sidewalks and parking lot in front of CiCi's Pizza, that Marion Forum failed to fill large potholes in a timely manner, and that Marion Forum did not maintain proper traffic signs, which created a dangerous intersection near CiCi's Pizza. Mick McCardle, Lynick's president and the operator of the CiCi's Pizza at issue in this case, testified that he had repeatedly discussed the maintenance issues with Dave Wakeman, the senior property manager for NAI Ohio Equities. (Tr. Vol. II at

334-335); (*Id.* at 266). Ohio Equities was the agent for the management of the Marion Forum Shopping Center. (*Id.* at 266). McCardle testified that he had a conversation with Wakeman that was witnessed by the former assistant manager of CiCi's Pizza. (*Id.* at 365-366). McCardle told Wakeman that there were numerous issues, including grates that needed repaired, problems with the landscaping, and problems with the lighting. (*Id.*). McCardle testified that he told Wakeman that according to the lease, McCardle could fix the problems himself and deduct the cost from his rent. (*Id.*). According to McCardle, Wakeman refused to permit McCardle to fix the maintenance issues because Wakeman believed it was Ohio Equities' responsibility. (*Id.*).

{¶18} McCardle also testified that he wrote multiple letters regarding the maintenance issues to Ohio Equities. (*Id.* at 358-359). McCardle sent the first letter to Sherry Howard, the Controller for Ohio Equities, on March 29, 2008. (*Id.*); (D. Ex. P). In that letter, McCardle informed Ohio Equities of the maintenance issues he felt were negatively impacting his business, including the exterior lighting, traffic signs, potholes, parking lot conditions, and semi-trucks parked in front of the restaurant. (*Id.*); (*Id.*). McCardle testified that he did not receive a response to his first letter. (Tr. Vol. II at 358-359).

{¶19} McCardle testified that following that conversation, he sent a second letter to Howard on April 29, 2008. (*Id.*); (D. Ex. P). In the second letter,

McCardle stated he was following up on his previous letter, noted that the maintenance problems had not been resolved, and stated that he was going to seek whatever remedies he could to address the issues. (*Id*.); (*Id*.). In that letter, McCardle informed Ohio Equities that he would be withholding his common area maintenance payment and had informed his attorney of the problem. (D. Ex. P).

{¶20} McCardle testified that he sent a third letter on May 28, 2008, but sent the letter to Wakeman instead of Howard. (Tr. Vol. II at 367); (D. Ex. P). In that letter, McCardle repeated the ongoing issues he was having with the quality of the maintenance and that he believed the maintenance was negatively affecting his business. (*Id*.); (*Id*.). McCardle also stated that he had contacted his attorney and enclosed the first two letters. (D. Ex. P). On cross examination, McCardle admitted that he had not sent any of the letters by certified mail. (*Id*. at 421).

{¶21} Wakeman testified that he had met with McCardle to discuss the maintenance issues with him, but did not recall the exact conversation or when it took place. (*Id*. at 274). Wakeman also testified that Ohio Equities had received McCardle's May 2008 letter, and that he had sent McCardle a letter in response informing him that he had breached the lease by failing to pay his maintenance fees. (*Id*. 275-276). Wakeman testified that the letters McCardle sent Ohio Equities regarding the maintenance issues were not sent by certified mail, even though that was what the lease required. (*Id*. at 304-305).

**{¶22}** "Although courts generally should give effect to the plain meaning of the parties' unambiguously expressed intentions, in some circumstances, courts will not strictly enforce contractual language requiring notice in writing." *Gollihue v. Natl. City Bank*, 10th Dist. No. 11AP-150, 2011-Ohio-5405, ¶ 22, citing *Hackman v. Szczygiel*, 10th Dist. No. 06AP-187, 2006-Ohio-5872. In those cases, a failure to provide notice according to the terms of the contract may not preclude recovery on the contract where the party has received actual notice. *Gollihue* at ¶ 22-23; *Adair v. Landis Properties*, 10th Dist. No. 08-AP-139, 2008-Ohio-4593, ¶ 13; *Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio App.3d 95, 2003-Ohio-1227, ¶ 76 (7th Dist.). "The purpose of requiring written notice is not to be hypertechnical but, instead, to create certainty." *McGowan v. DM Group IX*, 7 Ohio App.3d 349, 353 (10th Dist.1982).

**{¶23}** In the present case, the record demonstrates that Marion Forum did receive actual notice of McCardle's maintenance issues through its agents, Wakeman and Howard. In fact, Marion Forum does not dispute that it received written notice, only that the notice was not properly provided through certified mail. We cannot find that McCardle's failure to send notice through certified mail precludes him from recovering for any breach of the contract where Marion Forum had actual notice. We will now review the evidence presented at trial to determine

if the jury's verdict was against the manifest weight of the evidence as Marion Forum contends.

## B. *Manifest Weight of the Evidence*

{¶24} The lease agreement between Marion Forum and Lynick states, "[Marion Forum] shall operate, maintain, and repair the Common Area in such a manner as [Marion Forum] in its sole discretion determine using, however first-class community shopping center practices." (D. Ex. T). The lease further provides that:

> The term 'Common Area Maintenance Costs' shall mean all costs, expenses and other charges incurred in connection with the ownership, operation, insurance, maintaining and repair of the Common Area, and shall include, but not be limited to, the costs and expenses of the following:
>
> (i) Removal of trash and garbage, excluding all garbage or trash of which the removal is regulated to be handled by others by any federal, state or local rule, law, statute, regulation, ordinance or code and all garbage and trash of any other tenant use in the Shopping Center;
>
> (ii) Exterior planting, replanting, replacing and upkeep of grass, flowers, shrubbery, plant, trees and other landscaping;

(iii) Maintenance, repair, replacement and substitution of all portions of the Common Area, including signs, planters, benches, common fire exits, doors and hardware, parking lot surfaces and traffic control systems * * *.

{¶25} At trial, Lynick presented numerous witnesses who testified about the lack of maintenance in the common area outside of CiCi's Pizza. Valerie Jolley, an employee at the dentist's office next to CiCi's Pizza, testified that the maintenance crews provided landscaping services, such as removing weeds, for the dentist's office but not for CiCi's Pizza. (Tr. Vol. I at 106-108). She had noticed that, within the last few years, Cici's Pizza received different treatment from the dentist's office because the weeds and snow were not removed from the area near the restaurant. (*Id.* at 113).

{¶26} William Doyle, a local mechanic, testified that there was a very large pothole near the entrance to the shopping center. (*Id.* at 116). Doyle repaired McCardle's vehicle in March 2008 after it hit the pothole, and had to replace the steering column as a result of the damage. (*Id.* at 116). Doyle testified that he had driven through the shopping center and sometimes had difficulty avoiding the pothole when other vehicles were in the exit lane. (*Id.* at 119). Doyle testified that the pothole was three or four feet in diameter. (*Id.*). Doyle also testified that, when McCardle first opened his restaurant, the outside area was well maintained,

but as time went on the parking lot went into disrepair. Doyle testified that it was sometimes so dark in the parking lot that it was difficult to see the neon sign indicating the restaurant was open. (*Id.* at 123).

{¶27} Sherry Dewalt, a former CiCi's customer, testified that she had sent a letter to McCardle in March 2008. (*Id.* at 130). In the letter, Dewalt informed McCardle that her family would no longer be customers because of the state of the parking lot, specifically the lack of lighting and poor snow removal. (*Id.* at 131-136); (D. Ex. E). Dewalt testified, "[t]he parking lot and the building were all really dark over there and it was hard to see when you would come over, and there was a lot of- there was a lot of snow piled up in the winter time, and it was hard to access the building." (Tr. Vol. I at 131).

{¶28} Connie Jeffries, the manager for the Subway restaurant located in the Marion Forum Shopping Center, testified that she had observed the maintenance problems outside of CiCi's Pizza. (*Id.* at 138-152). Jeffries testified that the common area was well maintained when CiCi's Pizza opened, but it had since deteriorated. (*Id.* at 139). Jeffries further testified that in early 2008 the parking lot lights started failing and a large pothole developed near the shopping center entrance. (*Id.*). Jeffries testified that at times avoiding the pothole was dangerous due to oncoming traffic. (*Id.*). According to Jeffries, the parking lot in front of CiCi's Pizza was roped off and inaccessible for around two weeks while the

parking lot was resurfaced. (*Id*. at 142). Jeffries testified that Subway's business did not suffer, but she believed that was because it was located in a different section of the shopping center. (*Id*. at 146).

{¶29} Ben Kelly, the former assistant manager of CiCi's Pizza, testified that he worked at CiCi's Pizza from the summer of 2007 until the summer of 2009. (*Id*. at 181). Kelly testified that there were consistent problems with the lighting, including canister lights hanging down on their wires, lights out on the CiCi's Pizza sign near the road, and lights out in the parking lot. (*Id*. at 182-185). "At night it just- looked desolate to an extent." (*Id*. at 189). Kelly also testified that there were problems with the snow removal, including "numerous incidents * * * with no salt being laid, the walk just not being shoveled at all to the point of- I mean, we had numerous complaints from people. * * * had a couple elderly people that had fell [sic] * * *." (*Id*. at 193). According to Kelly, the stop signs were frequently knocked over rather than standing upright, and that he and the other employees had to pick up trash in the parking lot because the maintenance crews did not take care of it. (*Id*. at 194-196). Kelly testified that he had a telephone conversation with Wakeman, "he told me on the phone that he understood that there were some issues that needed attended to, but there were empty buildings or other tenants that hadn't been paying their rent and the funds were not available at that time." (*Id*. at 198-199). Kelly also testified that he was

working at CiCi's Pizza when the parking lot was resurfaced. (Tr. Vol. II at 204). Kelly testified that the parking lot was supposed to be resurfaced at night, but the work was done during business hours instead, which prevented people from accessing the restaurant for four or five days. (*Id*. at 204-206).

{¶30} McCardle testified that his lease was originally with the Kibbey family, but that Marion Forum later purchased the property and took over the lease. (*Id*. at 325-326). According to McCardle, he did not have any problems with the maintenance when Marion Forum first took over the property, but the quality of the care began to change in late 2007. (*Id*. at 329-332). McCardle testified that at that point, there was a "[l]ack of landscaping, no one picking up trash, potholes, and continued problems that had started to manifest themselves with building lights, signs, et cetera, parking lot lights." (*Id*. at 332). McCardle further testified that he and his wife had to remove weeds because the maintenance crew would spray them with chemicals and leave the dead weeds. (*Id*. at 334-336). McCardle testified that he had a constant problem with water collecting in front of his restaurant because the drains did not work correctly. (*Id*. at 340). McCardle also testified that his major concern was the lack of lighting because the lights were not replaced after they went out. (*Id*. at 341-342). McCardle testified that the stop signs near the entrance to the shopping center were frequently broken or covered with snow, which made it dangerous to enter or exit the shopping

center. (*Id*. at 351). According to McCardle, there was a large pothole, two and a half to three feet wide and at least a foot deep, near the entrance to the shopping center. (*Id*. at 360). McCardle testified that at times the pothole was unavoidable if there was too much traffic, and that it was there for several months. (*Id*.). McCardle further testified that the catch basin near the sewer had caved in and was a hazard for customers walking and driving by it. (*Id*. at 361-362). McCardle testified that semi-trucks often parked in the first and second row of spots in front of his business, and that the police could not do anything about it unless there were signs prohibiting the trucks from parking. (*Id*. at 364). McCardle testified that when Marion Forum did have the signs made, they placed them on the other side of the shopping center, which did not prevent the semi-trucks from parking in front of his restaurant. (*Id*.). McCardle testified that over a third of his business occurred at night, so the lack of lighting in the parking lot, the problems with his sign being lit properly, and lights that were burnt out on the front of the building were very detrimental. (*Id*. at 371).

{¶31} McCardle also testified that he had problems with the maintenance crews failing to remove snow on the sidewalks and in the parking lot near his restaurant, and that the maintenance crew told him that they would only put salt on the snow, rather than shoveling it, unless the snow was at least three inches deep. (*Id*. at 381). McCardle testified that the salt and snow resulted in customers

dragging slush into his restaurant, which made it impossible to keep clean. (*Id.*). McCardle testified about pictures demonstrating that the snow had been cleared from the sidewalks in the rest of the shopping center, but that the sidewalks in front of his restaurant remained covered with snow. (*Id.* at 388). McCardle further testified that he had a couple of incidents where a customer fell outside of his restaurant, and that he had to pay for a customer who was treated at an urgent care facility after falling on the ice. (*Id.* at 390).

{¶32} In response, Marion Forum presented witnesses who testified that it provided common area maintenance as required pursuant to the lease agreement. Wakeman testified about repairs that were done to the lights and potholes at the shopping center. (*Id.* at 269-273). Wakeman testified that they could not resurface the parking lot at night because they needed the temperature to be above 55 degrees to complete the resurfacing and it was too cold at night at the time that they needed to complete the resurfacing. (*Id.* at 283, 309). Wakeman did not recall a conversation with McCardle where McCardle wanted to reduce his rent payments in exchange for the costs of maintaining the exterior himself. (*Id.* at 297). Wakeman testified that the shopping center had some electrical problems, but he did not think such problems were unusual because it was an older center. (*Id.* at 307). Wakeman testified that his relationship with McCardle was not very good, "He is not- he's not been like other tenants- engaging, I would say in a

respectful manner. He just- and he has been known to be abusive to my maintenance people that maintain the property and has shooed them away off the property." (*Id*. at 310).

**{¶33}** Craig Goodwin, a commercial property manager, testified about the quality of the maintenance at the shopping center. (Tr. Vol. III at 592). Goodwin testified that he was familiar with the shopping center because he worked for Kroger when it opened a store at that location. (*Id*. at 593-594). Goodwin testified that he believed the maintenance at the shopping center was consistent with the maintenance performed at similar shopping centers. (*Id*. at 595-596). Goodwin testified that some issues are difficult to address because they are unexpected, such as ice, snow, and burnt out lights. (*Id*. at 597-598). Goodwin testified that the cost of bringing a bucket truck out to change parking lot lights is prohibitive unless several need to be changed at the same time. (*Id*. at 599).

**{¶34}** Jason Johnson, an employee at Johnson Property Services, testified about the shopping center's maintenance services. (*Id*. at 612). Johnson testified that Wakeman at Ohio Equities had hired Johnson Property Services to provide the ground and facility maintenance. (*Id*. at 613). Johnson testified that:

Basically we maintain the existing facility, the ground and facility

maintenance and such, from weekly routine things you do at home,

lawn care, landscaping, pulling weeds and such, snow removal, ice

control. We shovel sidewalks, apply de-icers, plow snow. With our parking lots and street sweeping division, obviously we clean the sidewalks off, pick up litter, debris, and that's pretty much the grounds maintenance side of it, as far as the routine maintenance goes. With the facility maintenance and building maintenance, we inspect lighting, repair it as needed. Potholes.

(*Id*. at 614). Johnson testified that the maintenance condition of the Marion Forum Shopping Center was above average as compared to the other shopping centers where they provide service. (*Id*. at 617). Johnson further testified that the company holds weekly meetings where the maintenance crew raises any issues they have observed and they make plans to address them. (*Id*. at 618-619). Johnson testified that they train the staff on snow removal, with the goal of making the businesses accessible and safe. (*Id*. at 623-624). Johnson testified that as they clear an area, they also add salt to it. (*Id*. at 625). Johnson recalled that McCardle had called his office with concerns about snow removal, and Johnson testified that he immediately sent his crew to clear the area. (*Id*. at 627-628).

{¶35} Johnson testified that they respond differently to tenant calls depending on the issue. (*Id*. at 629). If it is an urgent issue, they will address it immediately. (*Id*.). If it is a larger or more expensive project, then they seek approval from Wakeman before beginning the work. (*Id*.). Johnson denied that

the lights in front of CiCi's were out for an extended period of time, testifying that his crew would have noticed the problem and brought it to his attention. (*Id*. at 630). Johnson testified that they did work on some catch basins and sewer grates. (*Id*. at 632). Johnson testified that McCardle's relationship is not good with the people in his company, "When I was brought up, it's the thing, you treat people how you want to be treated. We don't get treated- I don't get treated how I would like to. My guys, especially the sidewalk crew, has been treated very poorly." (*Id*. at 633-634). Johnson also testified that McCardle had complained about how the maintenance crew was salting the sidewalk. (*Id*. at 636-637). Johnson testified that he wanted to keep the tenants happy, but decided to continue salting the sidewalk because he was concerned about safety. (*Id*.). Johnson testified that his crew does spray weeds to kill them, and that they manually remove them if they are large but leave them if they are small because they are not that unsightly. (*Id*. at 647-649). Johnson denied that the maintenance crews treated the area near CiCi's Pizza any differently than the rest of the shopping center and further testified that he has not had any complaints from tenants in the rest of the shopping center. (*Id*. at 638- 639).

{¶36} After reviewing the evidence, we find that Lynick presented competent, credible evidence supporting the jury's verdict. Although the evidence was in dispute, Lynick presented witnesses who testified that Marion Forum failed

to replace burnt out lights, fix potholes, timely remove snow and ice, ensure water was properly draining from the property, remove weeds, landscape the area near CiCi's Pizza, and otherwise adequately maintain the property. This evidence, if credible, supports the jury's conclusion that Marion Forum did not maintain the property according to "first-class community shopping center practices" as required by the lease. (D. Ex. T). The jury is in the best position to make these credibility determinations. *Seasons Coal Co.*, 10 Ohio St.3d at 80. Consequently, we cannot find that the jury's verdict was against the manifest weight of the evidence.

{¶37} Marion Forum's first and third assignments of error are, therefore, overruled.

## Assignment of Error No. II

**The evidence is insufficient, as a matter of law, to support the decision that defendant-appellee was not in default of the contract and was not liable for damages**

## Assignment of Error No. IV

**The evidence is insufficient, as a matter of law, to support the decision that plaintiff-appellant was liable for damages**

{¶38} In its second and fourth assignment of error, Marion Forum argues the evidence is insufficient to support the jury's verdict. Marion Forum admits that it did not move for a directed verdict or judgment notwithstanding the verdict, but contends that this case is one of the rare exceptions when plain error applies.

{¶39} The plain error doctrine is not favored in appeals of civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). The plain error doctrine should only be applied in the extremely rare civil case "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.*

{¶40} We cannot find any evidence supporting Marion Forum's assertion that the present case involves exceptional circumstances requiring this Court to apply the plain error doctrine. Furthermore, even if Marion Forum had made the appropriate objections, this Court would not find that the evidence was insufficient to support the jury's verdict. In civil cases, "[i]f applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court [if] 'the evidence is legally sufficient to support the [judgment] as a matter of law.'" *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In the present case, Lynick presented sufficient evidence that Marion Forum failed to maintain the property according to "first-class community shopping center practices" as required by the lease. Consequently, we cannot find that the evidence was insufficient to support the trial court's judgment.

{¶41} Marion Forum's second and fourth assignments of error are, therefore, overruled.

**Assignment of Error No. V**

**The manifest weight of the evidence fails to establish lost profits with sufficient certainty**

{¶42} In its fifth assignment of error, Marion Forum argues Lynick failed to establish its lost profits with sufficient certainty. Marion Forum contends that Lynick's accountant and expert witness did not include all of Lynick's costs when determining the lost profits. Marion Forum also argues that Lynick's lost profits could be for reasons other than the common area maintenance, such as increased unemployment.

{¶43} Generally, a prevailing party may recover lost profits for a breach of a contract when the "profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits were not remote and speculative and may be shown with reasonable certainty." *Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 244 (1984). Evidence of the lost profits must be presented with supporting information regarding how the profits were calculated based on facts available or in evidence. *Endersby v. Schneppe*, 73 Ohio App.3d 212, 216-217 (3d Dist.1991).

{¶44} In the present case, Marion Forum acknowledged that the parties contemplated profits when they entered into the contract as profits are the purpose for a commercial lease. (Tr. Vol. III at 674). Howard Cannon, a restaurant consultant and expert witness for Lynick, testified at length regarding the cause of Lynick's lost profits. (*Id*. at 448). Cannon evaluated CiCi's Pizza and determined that the restaurant was run very well. (*Id*. at 484). Cannon testified that he based his expert opinion on his personal observations and evaluation, CiCi's Pizza's corporate operation and service evaluations, CiCi's Pizza's quarterly revenues from 2005 through 2010, representative sales figures for other CiCi's Pizza restaurants in Ohio, and the lease agreement between Lynick and Marion Forum. (*Id*. at 448-470). Cannon testified that "[t]he only thing I saw that if I were the operator, I would have been screaming and shouting about was the exterior of the facility, which in my opinion was an F, clearly." (*Id*. at 484). Cannon further testified:

> I think everyone could argue, well, everybody's opinion of first class may be something different, and therefore, there's some gray area there, but I don't think anybody could argue potholes in the parking lot clearly can't be first class. Lighting being burnt out or broken clearly can't be first class. Signage being broke or burnt out clearly couldn't be first class.

(*Id*. at 487-488). Cannon testified that a positive first impression is vital to attract customers to a restaurant, "the determination whether to go to a restaurant happens in a two to 32 second time frame. I mean, it's literally that quick." (*Id*. at 478-479). Cannon testified that customers may not realize a restaurant is open if the lighting is inadequate, and may also think that, "if you can't have your lighting correct or if you can't have your parking lot correct or your signage correct, chances are pretty good you also cannot handle my pizza or my hamburger * * *." (*Id*.). Cannon testified that, based on the poor lighting, he would not have been surprised if customers did not realize CiCi's Pizza was open or did not even know the restaurant was in the shopping center. (*Id*.).

**{¶45}** Cannon also testified that the economy was not the source of Lynick's lost profits. According to Cannon, well operated restaurants perform better than poorly operated restaurants during bad economic times. (*Id*. at 489-490). Cannon testified that customers will continue to dine at restaurants even when the economy is bad, but they select restaurants that are well run and inexpensive. (*Id*.). Cannon testified that he would expect a restaurant such as CiCi's Pizza to do well during a poor economy because it was well operated and inexpensive. (*Id*.). Cannon testified that the performance of the CiCi's Pizza at issue was unexpected because its profits were lower than comparable restaurants,

even though Cannon could not find any problems with how McCardle operated the restaurant. (*Id*. at 492-494). Cannon's expert opinion was:

it is probable, more than 50 percent certainty, that [Marion Forum]'s neglect of its common area maintenance duties to [Lynick], doing business as CiCi's, directly caused loss of community image, customers in sales and this common area directly led to a loss of between 17 and 23 percent of [Lynick]'s annual sales volume in 2008 and 2009 versus its 2007 levels. This figure represents a loss of somewhere between $121,908 and $164,934 for each year as stated. I'm also of the opinion that this same significant level of loss in sales volume will continue to impact the business for a period of between nine months and up to 18 months after all common area maintenance obligations are brought back up to total contractual compliance.

(*Id*. at 497-498).

**{¶46}** James Ditmars, Lynick's certified public accountant, testified regarding how he calculated the lost profits. (Tr. Vol. II at 245). Ditmars presented his records reflecting that CiCi's Pizza had annual sales of $717,003.26 in 2007. (*Id*. at 254-259); (D. Ex. L-2). In 2008, the annual sales declined to $540,420.38; in 2009 declined to $486.446.98; and in 2010 sales rose to

$497.330.86. (*Id.*); (*Id.*). Ditmars testified that the average sales for the first three years CiCi's Pizza was in business was $743,675, and the average for the last three years, 2008 through 2010, was $508,066. (*Id.*); (*Id.*). Ditmars calculated an average difference of $235,609. (*Id.*); (*Id.*). Based on the costs associated with the goods CiCi's Pizza sold, Ditmars estimated a gross profit of between 48 and 55 percent of sales. (Tr. Vol. II at 253-257). Ditmars testified that, from 2008 through 2010, CiCi's Pizza had lost profits of between $339,277 and $409,021, depending on the percent applied. (*Id.*).

{¶47} We cannot find that the evidence regarding lost profits was remote or speculative. Lynick presented evidence that Marion Forum's failure to properly maintain the common area was the cause of Lynick's lost profits through Cannon's expert testimony. Lynick also presented evidence regarding how the lost profits were calculated, along with the business records to support the testimony. We cannot find that Lynick failed to establish the lost profits with sufficient certainty, or that the jury erred by awarding $225,000, which is less than the award calculated by either Cannon or Ditmars. Lynick provided the jury with documentation of its annual sales as well as all of its costs, and Marion Forum cross examined each witness at length regarding the basis for their opinions. This Court cannot find any evidence that the jury failed to take these factors into account when making its judgment.

{¶48} Marion Forum's fifth assignment of error is, therefore, overruled.

**Assignment of Error No. VI**

**The trial court erred by awarding prejudgment interest to defendant-appellee**

{¶49} In its sixth assignment of error, Marion Forum argues the trial court erred by awarding Lynick prejudgment interest. Marion Forum contends that there is no evidence it failed to make a good faith effort to settle pursuant to R.C. 1343.03(C), so prejudgment interest is inappropriate in this case.

{¶50} A trial court's determination regarding whether to award prejudgment interest is reviewed for an abuse of discretion. *Lynda Hughes Dawson Lumber, Inc. v. Hummel*, 2d Dist. No. 09-CA-07, 2010-Ohio-4918, ¶ 16, citing *Damario v. Shimmel*, 8th Dist. Nos. 90760, 90875, 2008-Ohio-5582, ¶ 55. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶51} As an initial matter, we note that Marion Forum argues R.C. 1343.03(C) applies in the present case. R.C. 1343.03(C) states:

If, upon motion of any party to a *civil action that is based on tortious conduct*, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held

subsequent to the verdict or decision in the action that the party required to pay the money failed to settle the case, interest on the judgment, decree, or order shall be computed * * *.

(emphasis added). The present case is based on a breach of a contract, not tortious conduct. Consequently, R.C. 1343.03(C) is inapplicable.

**{¶52}** However, R.C. 1343.03 does govern a party's right to recover interest. *Lamar Advantage GP Co. v. Patel*, 12th Dist. No. CA2011-10-105, 2012-Ohio-3319, ¶ 56. R.C. 1343.03(A) provides, "when money becomes due and payable * * * upon all judgment, decrees, and orders of any judicial tribunal for the payment of money arising out of * * * a contract * * * the creditor is entitled to interest * * *."

**{¶53}** The Supreme Court of Ohio has held that prejudgment interest "is compensation to the plaintiff for the period of time between the accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." *Royal Electric Construction v. Ohio State Univ.*, 73 Ohio St.3d 110, 117 (1995). The Court has further stated that "[a]n award of prejudgment interest encourages prompt settlement and discourages defendants from opposing and prolonging, between injury and judgment, legitimate claims." *Id*. at 116-117. Prejudgment interest serves the additional

purpose of making the injured party whole by compensating the party for the period of time between the accrual of the claim and judgment. *Id*. at 117.

{¶54} We cannot find that the trial court abused its discretion by awarding prejudgment interest in the present case. The trial court properly considered the Supreme Court of Ohio's decision in *Royal Electric*, and determined prejudgment interest was appropriate for the purpose of fully compensating Lynick. (Doc. No. 96). Additionally, the trial court awarded Lynick prejudgment interest from the time it filed its counterclaim on February 26, 2009, rather than from the date Marion Forum initially breached its contract with Lynick. (Doc. No. 97). The trial court thus exercised its discretion by limiting Lynick's recovery. (*Id*.). As a result, we cannot find that the trial court's decision was unreasonable, arbitrary, or unconscionable.

{¶55} Marion Forum's sixth assignment of error is, therefore, overruled.

### Assignment of Error No. VII

**The trial court erred by assessing expert witness fees against plaintiff-appellant as costs**

{¶56} In its seventh assignment of error, Marion Forum argues the trial court erred by awarding Lynick expert witness fees. Marion Forum contends that the award of expert witness fees is not supported by any statutory authority or the parties' agreement, so the trial court's award was an error.

{¶57} Marion Forum's lease agreement with Lynick states, "[a]ny attorney fees incurred by a successful party to the enforcement of this Lease shall be paid by the unsuccessful party, which shall include court costs and other reasonable fees." (D. Ex. T).

{¶58} We cannot find that the trial court erred in interpreting the plain meaning of the contract to award Lynick expert witness fees as "other reasonable fees" in addition to attorney fees and court costs. Nor can we find that the trial court erred in determining that Lynick's expert witness fee was an "other reasonable fee" when expert witness testimony was required to demonstrate that Marion Forum's inadequate maintenance was the cause of the decline in CiCi's Pizza's profits in order to recover those lost profits. Consequently, we cannot find that Lynick's use of an expert witness was unreasonable given the circumstances of this case, or that the trial court erred by awarding Lynick expert witness fees in light of the parties' agreement.

{¶59} Marion Forum's seventh assignment of error is, therefore, overruled.

{¶60} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**